# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

GAYLE JOHNSON,                  )
    Plaintiff,                  )
                             )
    v.                          )      CAUSE NO.: 2:13-CV-138-PRC
                             )
CAROLYN W. COLVIN,              )
Acting Commissioner of the      )
Social Security Administration, )
    Defendant.                  )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Gayle Johnson on April 24, 2013, and Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security [DE 16], filed on October 4, 2013. Plaintiff requests that the March 8, 2012 decision of the Administrative Law Judge denying her claim for supplemental security income be reversed and remanded for further proceedings. On November 21, 2013, the Commissioner filed a response, and Plaintiff filed a reply on December 18, 2013. For the following reasons, the Court denies Plaintiff's request for remand.

## BACKGROUND

On June 1, 2010, Plaintiff Gayle Johnson filed an application for supplemental security income due to diabetes, restless leg syndrome, and vision problems, alleging an onset date of October 1, 2008. The application was denied initially on September 8, 2010, and upon reconsideration on February 14, 2011. Plaintiff filed a timely request for a hearing on March 23, 2011, which was held on March 1, 2012, before Administrative Law Judge ("ALJ") Jonathan Stanley. In appearance were Plaintiff, her attorney, and vocational expert Richard T. Fisher. At the hearing, Plaintiff alleged disability due to chest pain, diabetes, "constant headaches," trouble

breathing, leg cramps, back pain, depression, high blood pressure, blurry vision, and numbness in her left hand. She estimated that she could sit for sixty to ninety minutes at a time.

The ALJ issued a written decision denying benefits on March 8, 2012, making the following findings:

1. The claimant has not engaged in substantial gainful activity since June 1, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following medically determinable impairments: diabetes mellitus, hypertension (HTN), hyperlipidemia, a polysubstance abuse disorder (20 CFR 416.921 *et seq.*).

3. The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR and 416.921 *et seq.*).

4. The claimant has not been under a disability, as defined in the Social Security Act, since June 1, 2010, the date the application was filed (20 CRF 416.920(c)).

(AR 11-19).

On March 4, 2013, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. On April 24, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

# STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [the claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. § 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 416.920(a)(4). The steps are: (1)

Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

At step two of the sequential analysis, the ALJ found that Plaintiff does not suffer from any impairments that significantly limit her ability to perform basic work activities. *See* 20 C.F.R. § 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly

limit your physical or mental ability to do basic work activities."). Basic work activities are "the abilities and aptitudes necessary to do most jobs," examples of which include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers[,] and usual work situations; and
(6) Dealing with changes in a routine work setting.

20 C.F.R. § 416.921(b). In other words, an impairment is "not severe" if the medical evidence establishes only "a slight abnormality (or a combination of slight abnormalities) that have no more than a minimal effect on an individual's ability to do basic work activities." SSR 96-3p, 1996 WL 374181 (Jul. 2, 1996); SSR 85-28, 1985 WL 56856 (Jan. 1, 1985). At this step, the burden on the claimant is *de minimis*. *See Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir. 1990) (citing *Bowen v. Johnson*, 482 U.S. 922 (1987)). The mere diagnosis of an impairment does not establish that the impairment affects the individual's ability to perform basic work activities. *Estok v. Apfel*, 152 F.3d 636, 639 (7th Cir. 1998); *see also Philpott v. Colvin*, 1:13-CV-01708-JMS, 2014 WL 4244299, at *4 (S.D. Ind. Aug. 26, 2014); *Flint v. Astrue*, 1:11cv1480, 2013 WL 30104, *5 (S.D. Ind. Jan. 2, 2013); *Stanley v. Astrue*, 1:11cv248, 2012 WL 1158630, *8 n. 8 (N.D. Ind. Apr. 6, 2012).

The ALJ found that Plaintiff had medically determinable impairments of diabetes mellitus, hypertension, hyperlipidemia, and polysubstance abuse disorder but that they were not severe, either singly or in combination. The ALJ then found that Plaintiff had the "non-medically determinable" impairments of carpal tunnel syndrome and/or peripheral neuropathy, vision loss, restless leg syndrome, hepatitis C, migraine headaches, a low back disorder, and mitral valve prolapse. (AR 17).

Plaintiff argues that the ALJ erred in finding her not disabled because he did not properly assess her credibility, improperly dismissed the state agency medical consultants' opinions, mischaracterized the evidence, improperly found that none of her impairments were severe, and improperly found that several of her conditions were not medically determinable impairments. For all the reasons set forth below, the Court finds that substantial evidence support the ALJ's decision and the ALJ did not make any errors of law requiring remand.

## A. Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the claimant's symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* "There must be medical signs and laboratory findings which show that [the claimant has] a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged" and the alleged symptoms must "reasonably be accepted as consistent with the medical signs and laboratory finding" and other evidence of record. *Id.* The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)   The individual's daily activities;
(2)   Location, duration, frequency, and intensity of pain or other symptoms;
(3)   Precipitating and aggravating factors;
(4)   Type, dosage, effectiveness, and side effects of any medication;
(5)   Treatment, other than medication, for relief of pain or other symptoms;
(6)   Other measures taken to relieve pain or other symptoms;
(7)   Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 416.929(c)(3). An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996).

However, a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p, 1996 WL 374186, at *6 (Jul. 2, 1996). "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). "[I]f the determination rests on objective factors or fundamental implausibilities rather than subjective considerations like demeanor, [the court has] greater freedom in reviewing the decision. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) (internal quotation marks and citation omitted) (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). Nevertheless, the Court may not reweigh the facts or reconsider the evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this case, the ALJ found Plaintiff to be less than fully credible, in part, because of inconsistent information she gave on various occasions. Social Security Ruling 96-7p provides that "the lack of consistency between an individual's statement and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible." SSR 96-7p, at *5. The ruling notes that symptoms may vary in intensity, persistence, and functional effects and that they may worsen or improve with time. *Id*. Thus, an ALJ must "review the case

record to determine whether there are any explanations for any variations in the individual's statements about symptoms." *Id.*

Plaintiff points to three of the several inconsistencies that the ALJ identified to argue that the ALJ did not inquire into the reasons for the inconsistencies and that these inconsistencies "could easily be the result of normal changes in [Plaintiff's] condition effected[sic] by treatment or the diseases worsening or improving, and hardly are indicative of [Plaintiff's] credibility." (Pl. Br. 9). These inconsistencies are that (1) Plaintiff reported cramping and pain in her lower left extremity when she had previously denied any history of cramping; (2) the ALJ cited ongoing, periodic treatment notes from February 2011 onward, which he found inconsistent due to "random complaints of headaches, grip problems, and radiating lower back pain;" and (3) the ALJ pointed to Plaintiff's allegations in June 2010 that she suffered "occasional" headaches, while in the August 2010 Headache Questionnaire she wrote that she was experiencing three to four migraines a week. (AR 15-16). Of these three inconsistencies, Plaintiff correctly notes that the ALJ misstated the record concerning the frequency of headaches, as she actually wrote that she experienced headaches three to four times a "month" on the Headache Questionnaire, which is not necessarily inconsistent with "occasional" headaches. However, Plaintiff does not dispute the inconsistencies regarding her leg. And, as for the "random complaints" in 2011, Plaintiff fails to note the ALJ's full concern, which was that "no diagnostic testing was ordered by the claimant's physician" for these complaints. (AR 16). Tellingly, Plaintiff offers no citation to the evidence of record to show that the ALJ improperly identified these inconsistencies. Other than the headaches, the ALJ did not err in noting the other two inconsistencies.

Plaintiff also argues that the ALJ erred in finding Plaintiff's statements inconsistent regarding her illegal drug use. On June 26, 2010, Plaintiff presented at St. Catherine Hospital with

complaints of chest pain. The ALJ found Plaintiff's credibility damaged because she denied drug use during intake at the hospital on June 26, 2010, yet objective drug tests during the hospitalization were positive for cocaine and cannabis. (AR 15). This is an accurate statement of the record. The June 26, 2010 intake record provides: "The patient denies depression and anxiety, denies use of recreational drugs and alcohol." (AR 186). The objective testing was positive the following day, June 27, 2010, for cocaine and cannibis. (AR 194). Plaintiff is correct that, on June 27, 2010, she admitted illegal drug use to the consulting physician during her hospitalization, with the record noting that "[s]he smokes marijuana routinely and smokes cocaine, the last time was 2 days ago and that is when she said the chest pain started getting really bad." (AR 180). But the fact that she told the truth on the day that she underwent drug testing does not cure the fact that the day before she denied drug use. Later in the credibility determination, the ALJ notes that Plaintiff also denied the use of alcohol and drugs to the consultative examiner, J. Smejkal, M.D., less than two months after hospitalization, on August 2, 2010. (AR 228). The ALJ was correct that Plaintiff gave inconsistent statements regarding her illicit drug use.

The ALJ also found inconsistent Plaintiff's statements regarding her use of medication to relieve headaches: "She . . . told the examiner that she used over-the-counter pain relievers for her headaches, which is also very inconsistent with the claimant's *Headache Questionnaire* that indicated the claimant utilized her friend's pain medications without prior physician approval." (AR 15). Notwithstanding Plaintiff's attempt to reason otherwise, the ALJ accurately summarized the record, and the statements are inconsistent. On August 2, 2010, Plaintiff told consultative examiner Dr. Smejkal that she takes over-the-counter medication for her headaches. (AR 227). In contrast, on the Headache Questionnaire on August 10, 2010, Plaintiff responded to the question regarding how

she treats her pain with the statement: "Dark, no noise and what ever pain pill I can find. (Usually a friends[sic] prescription)." (AR 147).

Next, Plaintiff criticizes the ALJ's statement that "the objective record outlined above included numerous office visit notes that indicated the claimant did not specify any particular complaint, which contrasts with the current claim of ongoing, disabling symptoms since the alleged onset date." (AR 16).[1] Plaintiff's argument is that the ALJ did not cite any specific evidence to substantiate this finding, and Plaintiff points to several records where she made specific complaints. (Pl. Br. 10 (citing (AR 180, 181, 183, 185, 209, 227, 228, 245, 252, 272, 274, 299, 302, 314, 316-330))).

Pages 180, 181, 183, 185, and 209 all relate to Plaintiff's June 2010 hospitalization. Pages 227 and 228 are the record of her August 2010 consultative examination with Dr. Smejkal. Page 245 (and a copy at page 299) is a December 21, 2010 follow up visit with her treating physician for her diabetes and hypertension. At that visit, she complained of back pain after moving furniture, which the ALJ discussed: "[I]n December, the claimant did report lower back pain after 'moving furniture' but her exam was benign aside from her subjective complaints." (AR 16). Page 252 is a routine check up for diabetes in June 2010, before her hospitalization; she also complained of blurred vision for one year and pain in her left knee. The physical examination at that visit showed a "gait stable and station mid position and normal." (AR 252). On neurological exam, her deep tendon reflexes were normal and sensations were intact bilaterally. The doctor's impression was controlled diabetes. Pages 272 and 274 are from the January 2012 initial mental health examination that Plaintiff underwent at which Plaintiff reported a history of diabetes, high blood pressure, high cholesterol,

---

[1] Plaintiff incorrectly cites page 17 of the administrative record for this quotation.

leg pain with weakness, migraine headaches, hot flashes, and chest pain. Page 302 is a February 12, 2011 treatment note showing that she presented for check up on hypertension, diabetes, and hot flashes. Notably, she did not indicate any other complaints. Page 314 is a January 18, 2012 progress note. Under "problems" it appears to be written that she complained of weight loss and low blood pressure.

Pages 316-30 are treatment notes from January 2011, when Plaintiff began treating with Dr. Patel, through October 2011. In January 2011, her complaint was lower back pain from moving the furniture. However, the records in February and March 2011 simply list "follow up" as the reason for the visit and do not list any complaints. (AR 324-25). Similarly, the June 15, 2011 progress note shows only a complaint of hot flashes and that she could not afford her medications. (AR 321). On June 29, 2011, Plaintiff had a follow up visit and complained of headaches. (AR 320). On July 29, 2011, Plaintiff complained of headaches and back pain and asked for a refill of Vicodin. (AR 319). The doctor told her he would not prescribe Vicodin and added Ultram. On August 29, 2011, Plaintiff had a follow up visit and complained of headaches and hand numbness. (AR 318). On September 19, 2011, Plaintiff complained of chest pain and hot flashes. (AR 317). And, on October 17, 2011, Plaintiff complained of lower back pain radiating to her lower left extremity. (AR 316).

Plaintiff does not include the record at page 315, which is the subsequent visit in December 2011, which was a follow up on her diabetes and at which she did not complain of leg pain, although she did complain of left wrist pain. (AR 315). The January 25, 2012 treatment record was for follow up on her diabetes mellitus. (AR 313). Thus, the ALJ was not incorrect when he wrote that several of these records did not include any particular complaint and were just for follow up.

Next, the ALJ found that his own observations of Plaintiff at the hearing detracted from her credibility regarding the severity of her impairments. He wrote,

First, the [undersigned] notes that the claimant betrayed no evidence of pain or discomfort while testifying at the hearing. While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations with regard to the severity of her impairments.

(AR 16). Plaintiff notes that Social Security Ruling 96-7p provides: "In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject the individual's complaints *solely* on the basis of such personal observations." SSR 96-7p, at * 8 (emphasis added). The ALJ in no way relied "solely" on his personal observations. Rather, the slight weight he gave this finding in combination with the remainder of his credibility determination was proper.

Finally, Plaintiff contends that the ALJ erred when he found that Plaintiff's failure to follow her prescribed regimen detracts from her allegations regarding the severity and limiting nature of her impairments. (AR 17). A claimant's failure to follow a prescribed treatment plan, absent a good reason, is a factor in the credibility. *See* 20 C.F.R. § 416.930; *Craft*, 539 F.3d at 679 (noting that the medical records showed that the plaintiff had been noncompliant for financial reasons and that the ALJ entirely ignored this evidence and did not question the plaintiff on noncompliance). In this case, there are some notations in the treatment record that Plaintiff could not afford her medications. *See* (AR 15, 270-71, 282, 316). In his recitation of the medical facts, the ALJ noted one of these instances. (AR 15) (citing Ex. 4F). However, the ALJ erred by not discussing Plaintiff's ability to pay for medications when he noted her noncompliance in the credibility determination. Nevertheless, this error was harmless because the ALJ explicitly stated that he did not make the decision based on noncompliance but only noted that her non-compliance detracted from her allegations. (AR 17). Noncompliance was only one of many reasons articulated by the ALJ in his decision. An ALJ's credibility determination need not be flawless. *Simila*, 573 F.3d at 517. Only

when it is "lack[ing] any explanation or support," will it be deemed "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). The ALJ's credibility determination was not patently wrong, and the Court will not disturb it.

## B. Weight to Consultative Reviewer

On August 2, 2010, Dr. Smejkal conducted a detailed physical consultative examination of Plaintiff. The findings were entirely unremarkable. Subsequently, state agency medical and psychological consultants reviewed the record and offered opinions. In his decision, the ALJ noted that the record contained these reviewing opinions. (AR 17 (citing Exs. 1A, 6F, and 7F)). The document at Exhibit 1A is the "Disability Determination Explanation." At the outset of the document, under the heading "Medically Determinable Impairments and Severity," are listed "diabetes mellitus" and "migraine" as "severe" impairments. (AR 53). Under the section titled "Psychiatric Review Technique," B. Randal Horton, Psy.D. opined on June 28, 2010, that there are "no medically determinable impairments." (AR 53). In the explanation section, he noted that Plaintiff was not seeing a mental health treater, that she was not taking any medications for a psychological impairment, and that she stated that her "ability to perform daily activities, such as cooking, cleaning, and laundry, are only effected[sic] by her physical problems." *Id*. Plaintiff reported that, with or without the physical problems, there were no psychological impairments that would be disabling.

Later in Exhibit 1A, under the heading "Residual Functional Capacity," dated September 6, 2010, Dr. Corcoran limited Plaintiff to a limited range of medium level work. Dr. Corcoran found Plaintiff only partially credible. In support, he noted the medical findings that her lungs were normal; her first and second heart sounds were normal with no gallops, murmurs, or clicks; muscle strength was 5/5; grip strength was 5/5 bilaterally; she had good fine finger manipulative abilities,

including the ability to button, zip, and pick up coins; vibration sense was normal but slightly diminished on the left; she had a normal gait, walked with a straight posture, could stoop, squat, walk heel to toe, and could tandem walk without difficulty; she could get on and off the exam table without difficulty and could stand from a sitting position without difficulty; and her range of motion for the spine, bilateral upper extremities, and bilateral lower extremities was within normal limits. Dr. Corcoran noted that Plaintiff reported headaches three to four times a month but that she was not being treated for headaches and had not been seen at an emergency room or hospital for headaches within the previous twelve months. (AR 55).

Exhibit 6F is the February 3, 2011 "Case Analysis" by consultative reviewer Joseph A. Pressner, Ph.D., which affirmed the June 28, 2010 psychological opinion of Dr. Horton. (AR 256). Exhibit 7F is the February 14, 2011 "Case Analysis" by consultative reviewer J. Sands, M.D. affirming the September 7, 2010 opinion of Dr. Corcoran. (AR 257).

Regarding these documents, the ALJ reasoned: "The State agency consultants' physical assessments, which deemed the claimant capable of performing less than a full range of medium work, were given little weight, as the claimant was not found to have an impairment or combination of impairments that significantly limits her ability to perform basic work activities." (AR 17) (citing Exs. 1A and 7F). The ALJ reasoned that, because he did not need to conduct a residual functional capacity assessment in this case, little weight was given to the opinions.

An ALJ may not ignore the opinions of state agency medical consultants and must explain the weight given to them. 20 C.F.R. § 416.927(e)(2)(ii); SSR 96-6p, 1996 WL 374180, *1 (July 2, 1996). In this case, the ALJ did not ignore these opinions and he explained the weight given to them. Nevertheless, Plaintiff argues that the ALJ erred by failing to discuss Dr. Corcoran's specific assessments and by not explaining any conflicts between the results of Dr. Corcoran's assessments

and his ultimate finding. Plaintiff accuses the ALJ of giving priority to his lay opinion over the expert medical opinion of Dr. Corcoran. The problem with Plaintiff's argument is that the ALJ did not make any medical determinations in discussing Dr. Corcoran's opinion; rather, he made the administrative decision at step two that Plaintiff did not suffer from a severe impairment based on his review of the entire record. Moreover, other than citing law and making sweeping arguments, Plaintiff does not identify any aspects of Dr. Corcoran's assessments, which the Court listed above, that are at odds with the ALJ's findings. The ALJ is not bound by the state agency consultant's opinion, and the ALJ properly considered Dr. Corcoran's assessment in light of the entire record. SSR 96-6p, at *1. Remand is not required.

### C. Medical Evidence

Plaintiff next contends that the ALJ erred in finding that her impairments were not severe by mischaracterizing evidence or failing to mention significant relevant evidence. A medically determinable impairment is severe when it significantly limits physical or mental abilities to do basic work activities, as set out above. 20 C.F.R. § 416.920(c).

First, Plaintiff criticizes the ALJ for finding that her allegations of symptoms consistent with her medically determinable impairments of diabetes mellitus, hypertension, hyperlipidemia, and polysubstance abuse disorder were not consistent with the available objective medical evidence. (AR 15). As noted above, Social Security Ruling 96-7p provides that "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, at *8. If the symptoms of a medically determinable impairment cause more than a minimal effect on the ability to do basic work activities, a finding of

severe impairment must be entered "even if the objective medical evidence would not itself establish that the impairment is severe." SSR 96-3p.

Plaintiff argues that several objective tests included "relevant anomalies" that the ALJ failed to mention. Regarding her liver, the ALJ noted that during her hospital stay in June 2010, physical examination of her liver "was consistent with a slightly enlarged, but normal liver." (AR 16 (citing Ex. 3F)). Plaintiff argues that she was admitted to the hospital in June 2010 in part for elevated liver enzymes, that she was diagnosed with elevated liver enzymes, and that later blood tests confirmed the existence of elevated liver enzymes. (Pl. Br. 15 (citing (AR 183, 185, 192, 196, and 242))). Plaintiff presented to the emergency room because of chest pain and was admitted due to chest pain, diabetes mellitus, hypertension, dyslipidemia, and elevated liver enzymes. (AR 185). Blood tests run at the hospital on June 27, 2010, showed elevated AST, ALT, and Amylase. (AR 192, 196). On July 1, 2010, blood test results showed elevated AST and ALT. However, Plaintiff does not explain how, much less assert, that any of these tests suggest that Plaintiff's liver condition affected her ability to do basic work activities. The ALJ did not err by not specifically discussing these tests, which do not conflict with the evidence of record that the ALJ discussed regarding Plaintiff's liver.

As for her diabetes, Plaintiff notes that the ALJ mentioned that Plaintiff's diabetes was controlled, which it was in certain medical records, without discussing evidence in the record that her diabetes was later assessed as uncontrolled. *See* (AR 313 (1/25/2012), 314 (1/18/2012), 315 (12/21/2011), 316 (10/17/2011), 317 (9/19/2011), 320 (6/29/2011), 321 (6/15/2011)). Plaintiff notes this in one sentence without discussion. These records simply note that her diabetes is uncontrolled on some occasions; these records also show that Plaintiff was not taking her medications as prescribed due to financial reasons. *See* (AR 316, 318, 321). Other evidence of record shows that Plaintiff's diabetes was controlled when she was following prescribed treatment. (AR 171

(7/9/2010), 227-32 (8/2/2010), 237 (6/17/2010), 249 (9/16/2010)). Again, Plaintiff does not point to any evidence that she has limitations that affect her ability to do basic work activities as a result of her diabetes.

Plaintiff also points to evidence of cardiovascular and pulmonary problems. She contends that the ALJ dismissed evidence of lower left lobe scarring and bradycardia because "the majority of the test results" were normal and that the ALJ stated that Plaintiff's cardiovascular and pulmonary exams in 2011 and 2012 "remained unremarkable." (AR 15, 16). Plaintiff argues that the ALJ failed to discuss record evidence of "further anomalies" revealed by the echocardiogram during her hospitalization in June 2010, including ventricular hypertrophy, trace mitral regurgitation, mild tricuspid regurgitation, and trace pulmonic valvular regurgitation. (AR 240-41, 306-07). She also notes that Dr. Corcoran commented that Plaintiff's June 28, 2010 stress test showed changes consistent with coronary artery disease. (AR 55). Plaintiff argues that the ALJ's failure to mention these objective findings by deeming them "unremarkable" is an improper finding for an ALJ to make, citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). However, in *Steele*, the ALJ identified EEGs showing seizure episodes as "unremarkable." *Id*. In this case, Plaintiff again fails to show, much less argue, how these findings from June 2010 show that any cardiac or pulmonary condition affects her ongoing ability to do basic work activities.

In his decision, the ALJ noted that, in his summary of the August 2, 2010 consultative examination, which was less than two months after the objective tests cited by Plaintiff, Dr. Smejkal noted that despite complaints of chest pain and shortness of breath there were no respiratory or cardiovascular abnormalities. This is accurate. Under "cardiovascular," Dr. Smejkal noted, "There is chest pain and shortness of breath on exertion." (AR 228). This is a recitation of Plaintiff's

18

subjective complaints. He then wrote, "No irregular heartbeat, tachycardia, and edema associated with dyspnea." *Id*. Later in the report, under the heading "physical examination" and the subheading "lungs," Dr. Smejkal wrote: "Normal chest wall movement with normal percussion in all lung fields. Normal vascular breath sounds without wheezing, rhonchi or rales noted. There is no increased A/P diameter and accessory muscle tone." (AR 229). Under the subheading "heart," Dr. Corcoran wrote, "Apex beat is not displaced and is normal in character. No parasternal heave or thrill. 1st and 2nd heart sounds are normal. No S3 or S4. No gallops, murmurs, or clicks heard. No pedal edema noted. Peripheral pulses are palpable, equal on both sides and normal in character." *Id*. Thus, the ALJ correctly described Dr. Smejkal's examination notes.

Plaintiff also points to "another examination" showing that Plaintiff presented with "tachypneic respirations." (Pl. Br. 16 (citing (AR 180))). This record is Plaintiff's admission to the hospital for chest pain on June 26, 2010, and it provides that her "[r]espirations were slightly tachypneic at 22." (AR 180). There are no other instances in the record of shortness of breath. The ALJ's failure to note this symptom upon Plaintiff's admission to the hospital, which the ALJ otherwise fully discussed, was not an error.

Regarding her back pain, Plaintiff argues that the ALJ mischaracterized the evidence when he noted that at a routine visit in December 2010, she reported back pain after moving furniture "but her exam was benign aside from her subjective complaints." (AR 16 (citing (AR 246))). To counter this finding, Plaintiff notes that the doctor's impression that date included low back pain. (AR 246). Plaintiff misses the point. The ALJ correctly noted that the *physical exam* by the doctor was benign. The doctor made the notation under "musculoskeletal" of "gait stable and station mid position and normal" and made the notation under "neuro" that deep tendon reflexes and sensations are normal.

(AR 246). All other physical findings were normal as well. Plaintiff does not identify any physical findings that were not normal. Thus, the impression of lower back pain appears to be based on Plaintiff's subjective complaints only. The ALJ did not mischaracterize the evidence.

Next, Plaintiff attacks the ALJ for using the expression "totally disabled" when commenting that, in check ups following February 2011 no diagnostic testing was ordered, "which is not the type of medical care one would expect an allegedly 'totally disabled' individual to be subjected to." (AR 16 (citing Ex. 10F)). Plaintiff argues that "totally disabled" is not the standard for determining whether an impairment is severe at step two. Again, Plaintiff misunderstands the ALJ's reasoning and takes a phrase out of context. The ALJ was not making a finding of disability past step two, but rather was referencing Plaintiff's claim that she was "totally disabled." Plaintiff's application for benefits claimed that she was "totally disabled," not simply that she had severe impairments at step two; thus, it was not incorrect for the ALJ to analyze the evidence in light of her claim of total disability.

Next Plaintiff argues that there is "some indication on[sic] the record that during that period, MRI testing and blood work was ordered." (Pl. Br. 16-17 (citing (AR 313))). The treatment record for January 25, 2012, referenced by Plaintiff, notes that she had blood work done at some point, although there is no contemporaneous record of blood work in the record. The document also contains what appear to be the words "MRI lumbar [illegible]." (AR 313). There is no order for an MRI, and there is no record of an MRI.

Apparently conceding that this notation carries no weight, Plaintiff argues instead that the ALJ failed to consider her medications when commenting that she was not receiving the type of treatment a "totally disabled" person would be expected to receive. She notes prescriptions for

Vicodin and Vicoprofen. (Pl. Br. (citing (AR 313, 319, 322, 324, 326))). The Court does not see a prescription for pain medication on AR 313, 322, or 326, and Plaintiff does not clarify what pain medication she believes is prescribed on each of those pages. On February 22, 2011, Plaintiff was prescribed Vicodin. (AR 325). On March 8, 2011, there is a prescription for Vicoprofen. (AR 324). On July 29, 2011, Plaintiff presented stating that she "needed" Vicodin, but the doctor explained that he would not give her Vicodin because it contains Tylenol. (AR 319). Instead, he prescribed Ultram. She notes a prescription for Aminophylline for chest pain and Flexeril as a muscle relaxant. (AR 209-211, 246-47). There are also notations of Vicoprofen on October 17, 2011, December 21, 2011, and Janaury 18, 2012 (AR 317, 316, 315).

Plaintiff cites *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004), which is distinguishable. In *Carradine*, the plaintiff had undergone pain treatment procedures that included not only "heavy doses" of Vicodin, Toradol, Demerol, and morphine but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator. *Id*. On this basis, the court found that it was unlikely that she had fooled doctors into believing that she suffered "extreme pain." *Id*. Similarly, in *Goble v. Astrue*, 385 F. App'x 588, 591 (7th Cir. 2010), also cited by Plaintiff, the plaintiff had been prescribed methadone and other medications and her doctors had ordered batteries of tests in response to her complaints of pain. Although the ALJ's decision would have been more complete had he discussed her medications, the overall record, which the ALJ fully discussed, does not support the severity of Plaintiff's subjective complaints of pain.

In her reply brief, Plaintiff cites *Parker v. Astrue*, 597 F.3d 920, 922-23 (7th Cir. 2010), as a case in which the ALJ improperly relied upon a lack of verifying objective medical evidence. *Parker* is distinguishable in that the ALJ relied solely on the lack of objective medical evidence to

find that the plaintiff's allegations were not true, and the plaintiff in *Parker* suffered from extreme pain with an unknown etiology. Notably, the court in *Parker* acknowledged that the absence of verifiable medical evidence of pain is not an inadmissible consideration in a disability proceeding. *Id*. at 922. In this case, Plaintiff does not suffer from extreme pain of an unknown etiology; rather, Plaintiff's alleged pain comes from various impairments for which objective tests are available but which were not ordered by Plaintiff's treating physicians.

Although the burden on Plaintiff is not high, substantial evidence supports the ALJ's conclusion that Plaintiff's medically determinable impairments do not significantly limit her physical or mental ability to do basic work activities. Nearly every physical examination was entirely normal, other than a single observation of muscle spasm in January 2011, following an injury to Plaintiff's back when she was moving furniture. Diagnostic testing was consistently normal and failed to account for Plaintiff's alleged symptoms. None of Plaintiff's concerns regarding the ALJ's treatment of the medical evidence requires remand.

### D. Non-Medically Determinable Impairments

Plaintiff argues that the ALJ erred by finding that her carpal tunnel syndrome, peripheral neuropathy, vision loss, restless leg syndrome, hepatitis C, migraine headaches, lower back disorder, and mitral valve prolapse were not medically determinable impairments. A plaintiff's "statements (or those of another person) alone . . . are not enough to establish that there is a physical or mental impairment." By themselves, symptoms, which are the plaintiff's own description of her impairments, do not overcome the burdens of step two. *See Swanson v. Colvin*, No. 1:13-cv-1194, 2014 WL 4162363, at *6 (S.D. Ind. Aug. 19, 2014) (citing 20 C.F.R. § 404.1528(b) ("Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your

statements (symptoms).")); 20 C.F.R. § 416.928(b). Rather, signs, symptoms, and laboratory findings are required to establish a medically determinable impairment. SSR 96-4p, 1996 WL 374187, at *1 (July 2, 1996). More specifically, the Ruling provides:

> Although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, *the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings*.

*Id.* (emphasis added).

Plaintiff argues that the ALJ found these impairments not to be medically determinable because there were no diagnoses of record, and then Plaintiff cites pages where various of these impairments were diagnosed in the treatment records. Plaintiff again misunderstands the ALJ's analysis. The ALJ made the statement in the context of the law the Court has just set out that there must be medical evidence consisting of signs, symptoms, and laboratory findings. The ALJ then went on to consider each of these non-medically determinable impairments and discussed how each did not meet this standard. (AR 17-18). The Court will not recount all of that evidence here as the ALJ's decision was thorough.

Plaintiff makes specific arguments only as to her headaches, hepatitis C, and mitral valve prolapse. First, Plaintiff argues that Dr. Corcoran diagnosed Plaintiff with migraine headaches during his consultative review of the record. (AR 53). She argues that the ALJ erred when he stated that there was no testing or symptomology consistent with migraine headaches. (AR 18). During her hospitalization in June 2010, the treating doctor noted that her headaches were "migraine in

character" based on Plaintiff's representations. (AR 181). There is no evidence that Plaintiff was suffering a migraine headache during her hospitalization. Plaintiff argues that there is no objective medical test that confirms the existence of migraines, as they "do not stem from a physical or chemical abnormality that can be detected by imaging techniques, laboratory tests, or physical examination." Pl. Br. 19 (citing *Stebbins v. Barnhart*, NO. 03-C-0117-C, 2003 WL 23200371, at \*10 (W.D. Wis. Oct. 21, 2003); *Tyson v. Astrue*, No. 08-CV-383, 2009 WL 772880, at \*9 (W.D. Wis. Mar. 20, 2009); *Longerman v. Astrue*, No. 11 CV 383, 2011 WL 5190319, at \*8-9 (N.D. Ill. Oct. 28, 2011)). Plaintiff goes on to argue that "symptoms consistent with migraine headaches, when documented by a physician in a clinical setting 'are, in fact, medical signs which are associated with severe migraine headaches' and are often the only way to prove the existence of migraines." (Pl. Br. 19 (citing *Ortega v. Chater*, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996)). This is exactly the ALJ's reasoning in this case, as he found "no testing or *symptomology* consistent with migraine headaches." (AR 18). There is no documentation by a physician in a clinical setting of the medical signs associated with migraine headaches.

Regarding her hepatitis C, the ALJ found that, although there are sporadic references to a *history* of hepatitis, "all testing was unremarkable." (AR 18 (citing Ex. 3F)). The ALJ noted that the laboratory work indicated slightly elevated liver enzymes but a computerized CT scan of the abdomen was unremarkable other than some enlargement. Plaintiff argues that, based on these tests, the ALJ should have found that she had the medically determinable impairment of hepatitis C. However, there is no evidence in the record of a hepatitis C antibody test. *See* http://www.cdc.gov/hepatitis/hcv/pdfs/hepctesting-diagnosis.pdf (last visited Sept. 22, 2014). Even

if Plaintiff's hepatitis C was a medically determinable impairment, Plaintiff has not argued that it affects her ability to do basic work activities.

Finally, Plaintiff argues that the ALJ should have found that she had the medically determinable impairment of mitral valve prolapse. The ALJ noted in his decision that mitral valve prolapse was not substantiated by "an echocardiogram, color flow doppler, or chest x-ray/magnetic resonance imagining (MRI)/or computerized tomography (CT) scan" resulting in a diagnosis. (AR 18). Plaintiff argues that the ALJ ignored several objective tests that showed some "medical abnormalities," (Pl. Br. 16), including findings of bradycardia (slow heart beat) and significant rhythm changes during her June 2010 hospitalization for chest pain.[2] She also notes that an echocardiogram during that hospitalization showed mild concentric left ventricular hypertrophy, trace mitral regurgitation, mild tricuspid regurgitation, and trace pulmonic valvular regurgitation. (AR 240-42, 306-07). Plaintiff fails to note that the "interpretive summary" from that test was that the left ventricle was normal in size, that there was normal overall left ventricular systolic function, that there was mild concentric left ventricular hypertrophy, and that the left ventricular wall motion was normal. (AR 240). While hospitalized in June 2010, a physical examination showed that Plaintiff experienced mild to moderate tenderness in her chest when palpitated. (AR 186). Dr. Corcoran noted that results of Plaintiff's stress test were consistent with coronary artery disease. (AR 55). "Mitral valve prolapse occurs when the valve between [the] heart's left upper chamber (left atrium) and the left lower chamber (left ventricle) doesn't close properly." http://www.mayoclinic.org/diseases-conditions/mitral-valve-prolapse/basics/definition/con-2002

---

[2] She also points to a reference in her June 2010 testing that it was compared to 2009, when she had scarring in the lower left lobe of her lungs (AR 166-67). Plaintiff does not explain how this objective finding related to her lungs supports a diagnosis of mitral valve prolapse.

4748 (last visited Sept. 22, 2014). There is no diagnosis of mitral valve prolapse in the record, and Plaintiff fails to demonstrate that these findings establish the medically determinable impairment of mitral valve prolapse.

## CONCLUSION

The standard for disability claims under the Social Security Act is stringent. "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). Furthermore, the standard of review of the Commissioner's denial of benefits is narrow. *Id.* Finding that Plaintiff received a full and fair review of her claims, the Court hereby **DENIES** the relief sought in Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security [DE 16] and **AFFIRMS** the decision of the Commissioner.

So ORDERED this 22nd day of September, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record